IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | CRIMINAL NO. 15-406 (PAD) |
| JOSE E. MONTALVO-FEBUS, | |
| Defendant. | |

**OPINION AND ORDER**

Delgado-Hernández, District Judge.

Defendant was charged in a 3-count indictment with transporting a 13-year old female minor (2 counts) and a 14-year old female minor (1 count) with the intent to engage in sexual activity in violation of 18 U.S.C. § 2423(a). Before the court is defendant's motion to dismiss (Docket No. 67), which the government opposed (Docket No. 92). For the reasons explained below, the motion is DENIED.

## I. BACKGROUND

Section 2423(a) provides that whoever "knowingly transports an individual who has not attained the age of 18 years in interstate or foreign commerce, or in any commonwealth, territory or possession of the United States, with intent that the individual engage in prostitution, or in any sexual activity for which any person may be charged with a criminal offense, shall be fined . . . and imprisoned not less than 10 years or for life." The section was originally enacted in 1910 as part of the Mann Act, also known as the "White Slave Traffic Act," 36 Stat. 825, Ch. 395 (1910)(codified as amended at 18 U.S.C. §§ 2421-2428). It is currently codified at Chapter 117 of Title 18 of the United States Code, titled "Transportation for Illegal Sexual Activity and Related Crimes."

As alleged in the indictment, defendant transported the minor(s) from locations in Salinas, Puerto Rico to other locations in Salinas, and from Salinas to Ponce, Puerto Rico (Docket No. 1). Relying on United States v. Maldonado-Burgos, 844 F.3d 339, 350 (1st Cir. 2016), however, he claims that § 2423(a) requires transportation across a state line or a foreign country (Docket No. 67 at p. 4-5). Given that any transportation here occurred solely within Puerto Rico, he asks that the indictment be dismissed. Id.

## II. DISCUSSION

### A. Basic Framework

In Maldonado-Burgos, the First Circuit dealt with § 2421(a) of the Mann Act, which prohibits transportation of an individual "in interstate or foreign commerce, or in any Territory or Possession of the United States" for purposes of prostitution or other unlawful sexual activity. See, 18 U.S.C. § 2421(a). As such, this section requires an interstate or foreign nexus in case of states, but requires no such nexus in case of territories or possessions. So the First Circuit faced the question whether § 2421(a) applies to illegal transportation occurring solely within Puerto Rico, a question in turn to be answered by the extent to which Congress intended to treat Puerto Rico as a state or territory under § 2421(a). See, Maldonado-Burgos, 844 F.3d at 343-345 (explaining inquiry).

Discussing the issue, the First Circuit examined the text of the statute, noting that "neither § 2421(a) nor any other provision of the Mann Act explicitly mentions Puerto Rico." Id. at 341.[1] Next, it surveyed the evolution of the relationship between Puerto Rico and the United States from 1898 when the United States invaded Puerto Rico up to the period of 1950-1952, when Congress passed legislation which later became part of the Federal Relations Act authorizing the People of

---

[1] To this end, see, United States v. Rivera, 131 F.3d 222, 224 (1st Cir. 1997)(statutory construction begins with the actual language of the provision)(citing Landreth Timber Co. v. Landreth, 471 U.S. 681, 685 (1985)).

Puerto Rico to adopt a constitution; and the Puerto Rico Constitution became law with congressional approval. Id. Along the same line, it: (1) observed that the congressional purpose behind the 1950-1952 legislation was to accord to Puerto Rico the degree of autonomy and independence normally associated with States of the Union (id.); (2) pointed to judicial decisions preceding that period that allowed prosecution for activity within Puerto Rico under the Mann Act and the Sherman Act (id. at 342); and (3) discussed Córdova & Simonpietri Insurance Agency, Inc. v. Chase Manhattan Bank N.A., 649 F.2d 36 (1st Cir. 1981), concluding that § 2421(a) did not apply to transportation that occurs solely within Puerto Rico. Maldonado-Burgos, 844 F.3d at at 343, 349-350.

The First Circuit explained that this is so, because under Córdova the court must ask whether the statute's framers, if aware of Puerto Rico's current constitutional status, would have intended it to be treated as a "state" or "territory." Id. And in its view, the framers of the Mann Act would have intended Congress to treat Puerto Rico as a State under § 2421(a). Id. at 350. Defendant contends Maldonado-Burgos requires the same conclusion in connection with § 2423(a).[2]

### B. Interaction of Factors

Several factors pull in different directions here. For one thing, the First Circuit emphasized that its holding in Maldonado-Burgos is a narrow one and applies only to the scope of § 2421(a) and not to the other provisions of the Mann Act. Id. at 350-351.[3] Similarly, it recognized that § 2421(a) and § 2423(a) specify separate crimes against separate classes of victims. Id. at 351. To that effect, § 2421(a) refers to the transportation of any individual, whereas § 2423(a) deals with

---

[2] The government maintains that the rationale and holding in Maldonado-Burgos are not ripe to serve as precedent in this case because on March 6, 2017, it filed a Petition for Rehearing *En Banc* in that case (Docket No. 92 at p. 1, n.1). Unless the First Circuit disallows reliance on Maldonado-Burgos, and to this day it has not done so, the court must follow it as precedent.

[3] This seems to call for an individualized assessment of each section of the statute sought to be applied in a given case.

transportation of individuals who have not yet attained the age of 18 years. Further, the First Circuit pointed out that these sections have not been amended in lockstep with one another. In that regard, Congress enacted the Protection of Children from Sexual Predators Act of 1998, expanding § 2421 and § 2423 to criminalize the attempt to violate their provisions, and increased the statutory maximum terms of imprisonment for violations of both provisions. However, before the bill was enacted, a floor amendment proposed adding the word "commonwealth," to the phrase "in any territory or possession of the United States" in § 2423(a), albeit not in § 2421(a). The amendment passed without explanation.

Still, the amendment may be significant as part of the analysis, because the Puerto Rico Constitutional Assembly decreed in 1952, that the official English-language name of the body-politic of Puerto Rico would be "Commonwealth of Puerto Rico," as it considered "commonwealth" an appropriate translation of Puerto Rico's Spanish-language name of "Estado Libre Asociado." See, Resolution No. 22 of the Puerto Rico Constitutional Convention, February 4, 1952, Miscellaneous Provisions, P.L. 5, P.R. Laws Ann. tit. 1 at pp. 135-136 (stating reason for adoption of English-language name). So there is a logical basis to conclude that Congress intended § 2423(a) to apply to transportation within the Commonwealth.

For another thing – and pulling in the opposite direction – the First Circuit noted that the critical fact in Córdova was the absence of specific evidence or clear policy reasons embedded in the Sherman Act to demonstrate a statutory intent to intervene more extensively into the local affairs of post-Constitutional Puerto Rico than into the local affairs of a state. See, Maldonado-Burgos, 844 F.3d at 344 (citing Córdova, 649 F.2d at 42). Applying the same formulation, it concluded that no such evidence or reasons demonstrated a congressional intent to apply § 2421(a) in Puerto Rico as a territory rather than as a State. Id. at 347-350. Even though § 2423(a) contains

the word "commonwealth" and § 2421(a) does not, assuming that post-Constitutional Puerto Rico is what it was when Córdova was decided in 1981, the argument may be made that § 2423(a) should be read the same way as § 2421(a) was read in Maldonado-Burgos. Nevertheless, putting all pieces together, the court understands that § 2423(a) applies to the conduct charged in this case.[4]

### C. Current Constitutional Status

As previously indicated, the First Circuit stated in Maldonado-Burgos that Puerto Rico's current constitutional status reflects congressional intent to grant Puerto Rico state-like autonomy. See, 844 F. 3d at 350 (citing Examining Bd. of Engineers, Architects and Surveyors v. Flores, 426 U.S. 572, 594 (1976)). But such status also features substantial congressional intrusion into local affairs to a degree not exerted over the states; an intrusion probably inconsistent with state status, and setting aside Congress' authority over the District of Columbia,[5] one perhaps only conceivable in the case of a territory subject to Congressional authority and control under the Constitution's Territorial Clause, U.S. CONST. art. IV, § 3, cl. 2.[6]

On that end, in 2016 Congress enacted the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"), Pub. L. No. 114-187, 130 Stat. 549 (2016), 48 U.S.C. §§ 2101-2241. In general, this statute creates a structure for exercising federal oversight over the fiscal affairs of territories including Puerto Rico, with a Financial Oversight and Management Board ("Oversight Board" or "Board") with broad powers of budgetary and financial control; puts in place procedures for adjusting debts accumulated by the Puerto Rico government and its

---

[4] Faced with a similar challenge under § 2422(a) of the Mann Act, in United States v. Lebrón-Cáceres, 157 F.Supp.3d 80 (D.P.R. 2016), this court concluded that § 2422(a) applies when the underlying conduct occurs solely within a territory like Puerto Rico.

[5] See, U.S. CONST. art.1, § 8, cl. 17.

[6] For a discussion of Congress' power over U.S. territories under the Territorial Clause, see Lebrón-Cáceres, 157 F. Supp.3d at 87-90, 96-97.

instrumentalities; and expedites approvals of key energy projects and other critical projects in Puerto Rico. See, D. Andrew Austin, *The Puerto Rico Oversight, Management, and Economic Stability Act (PROMESA; H.R. 5278, S. 2328)*, Congressional Research Service, July 1, 2016, at p. 1 (providing brief overview of statute).[7]

1. Oversight Board

PROMESA establishes an unelected Oversight Board appointed by the President, with broad powers over Puerto Rico's elected representatives. See, 48 U.S.C. § 2121(b)(1) and (e) (establishing Board, setting membership, and delineating appointment process). The Board is to be considered an entity within "the territorial government" for which it is established. Id. at § 2121(c)(1).[8] But neither the Governor nor the Legislature may exercise any control, supervision, oversight or review over the Board or its activities; or enact, implement, or enforce any statute, resolution, policy, or rule that would impair or defeat the purposes of PROMESA, as determined by the Board. Id. at § 2128(a). Moreover, the Board's Executive Director and staff may be appointed and paid without regard to any provision of the laws of the covered territory governing appointments and salaries. Id. at § 2123(c). The covered territory government's procurement laws shall not apply to the Board. Id.

---

[7] PROMESA consists of seven titles, as follows: Title I "Establishment and Organization of Oversight Board"); Title II ("Responsibilities of Oversight Board"); Title III ("Adjustment of Debts"); Title IV (Miscellaneous Provisions"); Title V ("Puerto Rico Infrastructure Revitalization"); Title VI ("Creditor Collective Action"); and Title VII ("Sense of Congress regarding Permanent, Pro-Growth Fiscal Reforms"). A complete analysis of all Titles is beyond the scope of this Opinion, which only summarizes the main provisions relevant to the question of whether Puerto Rico enjoys the degree of autonomy and independence normally associated with a State of the Union.

[8] In connection with PROMESA, the term "territory" includes Puerto Rico and four additional U.S. territories. See, 48 U.S.C. at § 2104 (20). The term "covered territory" means a territory for which an Oversight Board has been established. Id. at § 2104(8). PROMESA expressly establishes one such Board for Puerto Rico. Id. at § 2121(b)(1). Likewise, it defines "Government of Puerto Rico" as "the Commonwealth of Puerto Rico, including all its territorial instrumentalities." Id. at § 2104(11).

2. Access to Information

The Board shall have the right to secure copies, whether written or electronic, of such records, documents, information, data, or metadata from the territorial government necessary to enable the Board to carry out its responsibilities. Id. at § 2124(c)(2). Thus, at the Board's request, the Board shall be granted direct access to such information systems, records, documents, information, or data as will enable it to carry out is responsibilities. Id. The head of the responsible entity of the territorial government shall provide the Board with such information and assistance (including granting the Board direct access to automated or other information systems) as the Board requires. Id.

3. Fiscal Plans

The Governor must submit Fiscal Plans for Board approval and certification. Id. at § 2141(a). Such Plans shall provide estimates of revenues and expenditures in conformance with agreed accounting standards; ensure funding of essential public services; provide adequate funding for public pension systems; provide for the elimination of structural deficits; provide for a sustainable debt burden; include a debt sustainability analysis; improve fiscal governance, accountability and internal controls; enable the achievement of fiscal targets; create independent forecasts of revenue for the period covered by the Fiscal Plan; provide for capital expenditures and investments necessary to promote economic growth; adopt appropriate recommendations submitted by the Board; include such additional information as the Board deems necessary; ensure that assets, funds, or resources are not loaned to, transferred to, or otherwise used for the benefit of the territory or a covered territorial instrumentality unless permitted by the territory's constitution, an approved adjustment plan under Title IIII of PROMESA, or a Qualifying Modification approved under Title VI of PROMESA; respect the relative lawful priorities or

lawful liens, as may be applicable, in the constitution, other laws, or agreements of the territory or covered territorial instrumentality in effect prior to the date of PROMESA's enactment. Id. at § 2141(b).

The Board shall review any proposed Fiscal Plan to determine whether it satisfies the requirements of PROMESA. Id. at § 2141(c)(3). If the Plan does not satisfy such requirements, the Board shall provide to the Governor notice of the violation including recommendations for revisions to the Plan and an opportunity to correct the violation. Id. at § 2141(c)(3)(B). In turn, the Governor shall submit to the Board a revised proposed Fiscal Plan by the time specified in the Board's notice. Id. at § 2141(d)(1). If he fails to submit to the Board a Fiscal Plan that the Board in its discretion determines satisfies PROMESA, the Board shall develop and submit to the Governor and the Legislature a Fiscal Plan that satisfies PROMESA. Id. at § 2141(d)(2). In that case, the Fiscal Plan shall be deemed approved by the Governor. Id. at § 2141(e)(2).

4. Budgets

First, the Governor shall submit to the Board proposed budgets within the timeframe the Board sets. Id. at § 2142(a)(c)(1). If the Board determines that the budget is not compliant, the Board shall so notify the Governor, providing him with an opportunity to correct the violation. Id. at § 2142(c)(1)(B).[9] If the Governor fails to develop a compliant budget within the time the Board determines, the Board shall submit to the Governor and the Legislature a revised compliant budget. Id. at § 2142(c)(2).

Second, the Legislature shall submit to the Board the budget it has adopted, and the Board shall determine whether the budget is compliant. Id. at § 2142(d)(1). If the budget is not compliant, the Board shall provide to the Legislature a notice of violation that includes a

---

[9] The term "compliance budget" means a budget prepared in accordance with agreed accounting standards, and the applicable Fiscal Plan. See, 48 U.S.C. § 2104(6).

description of any necessary corrective action, and an opportunity to correct the violation. Id. at § 2142(d)(1)(B). If the Legislature fails to adopt the budget that in the Board's opinion is compliant by the day before the first day of the fiscal year for which the budget is being developed, the Board shall submit a budget to the Governor and the Legislature. That budget shall be deemed approved by the Governor and the Legislature, and shall be in full force and effect beginning on the first day of the applicable fiscal year. Id. at § 2142(d)(2) and (e)(3).

   5. Reports

Not later than 15 days after the last day of each quarter of a fiscal year (beginning with the fiscal year determined by the Board), the Governor shall submit to the Board a report, in such form as the Board may require, describing the actual cash revenues, cash expenditures and cash flows of the territorial government for the preceding quarter, as compared to the projected revenues, expenditures, and cash flows contained in the certified budget for such preceding quarter, and any other information requested by the Board which may include a balance sheet or a requirement that the Governor provide information for each covered territorial instrumentality separately. Id. at § 2143(a).

If the Board determines that the actual quarterly revenues, expenditures, or cash flows of the territorial government are not consistent with the projected revenues, expenditures, or cash flows set forth in the certified budget for such quarter, the Board shall require the territorial government to provide such additional information as the Board determines to be necessary to explain the inconsistency; and if the additional information does not provide an explanation for the inconsistency that the Board finds reasonable and appropriate, it shall advise the territorial government to correct the inconsistency by implementing remedial action. Id. at § 2143(b). If the territorial government fails to provide additional information or fails to correct an inconsistency,

the Board shall certify to the President, the House of Representatives Committee of Natural Resources, the Senate Committee on Energy and Natural Resources, the Governor, and the Legislature that the territorial government is inconsistent with the applicable certified budget, describing the nature and amount of the inconsistency. Id. at § 2143(c).

Should the Governor and the Legislature fail to correct the inconsistency, the Board shall make appropriate reductions in non-debt expenditures to ensure that the actual quarterly revenues and expenditures for the territorial government are in compliance with the applicable certified territory budget. Id. at § 2143(d)(1). With respect to covered territorial instrumentalities, the Board may make similar reductions, institute automatic hiring freezes, and prohibit the instrumentalities from entering into any contract or engaging in any financial or other transactions, unless the contract or transaction was previously approved by the Board. Id. at § 2143(d)(2).

6. Submission of legislative acts

Not later than 7 business days after the territorial government duly enacts any law during any fiscal year in which the Board is in operation, the Governor shall submit the law to the Board with a formal estimate prepared by an appropriate entity of the territorial government with expertise in budgets and financial management of the impact, if any, that the law will have on expenditures and revenues. Id. at § 2144(a). If the Governor fails to submit the estimate, the Board shall send a notification to the Governor and the Legislature to provide the missing estimate or compliance certification. Id. at §§ 2144(a)(3) and (4). In the event the territorial government fails to comply with a direction given by the Board, the Board may take such actions as it considers necessary, consistent with PROMESA, to ensure that the enactment or enforcement of the law will not adversely affect the territorial government's compliance with the Fiscal Plan, including preventing the enforcement of the law. Id. at § 2144(a)(5).

### 7. Contracts, Rules, Regulations and Executive Orders

The Board may establish policies to require prior Board approval of certain contracts, including proposed leases and contracts to a governmental entity or government-owned corporations rather than private enterprises, to ensure that such proposed contracts promote market competition and are not inconsistent with the approved Fiscal Plan. Id. at § 2144(b)(2). This authority extends to rules, regulations, and executive orders proposed to be issued by the Governor (or the head of any department or agency of the territorial government), in the same manner as such provisions apply to a contract. Id. at § 2144(b)(4). If a contract, rule, regulation, or executive order fails to comply with policies established by the Board, the Board may take such actions as it considers necessary to ensure that such contract, rule, executive order or regulation will not adversely affect the territorial government's compliance with the Fiscal Plan, including by preventing the execution or enforcement of the contract, rule, executive order or regulation. Id. at § 2144(b)(5).

### 8. Recommendations

The Board may submit recommendations to the Governor or the Legislature on actions the territorial government may take to ensure compliance with the Fiscal Plan, or to otherwise promote the financial stability, economic growth, management responsibility, and service delivery efficiency of the territorial government, including recommendations relating to: (1) the management of the territorial government's financial affairs, including economic forecasting and multiyear fiscal forecasting capabilities, information technology, placing controls on expenditures for personnel, reducing benefit costs, reforming procurement practices, and placing other controls on expenditures; (2) the structural relationship of departments, agencies, and independent agencies within the territorial government; (3) the modification of existing revenue structures, or the

establishment of additional revenue structures; (4) the establishment of alternatives for meeting obligations to pay for the pensions of territorial government employees; (5) modifications or transfers of the types of services that are the responsibility of, and are delivered by the territorial government; (6) modifications of the types of services that are delivered by entities other than the territorial government under alternative service delivery mechanisms; (7) the effect of the territory's laws and court orders on the operations of the territorial government; (8) the establishment of a personnel system for employees of the territorial government that is based upon employee performance standards; (9) the improvement of personnel training and proficiency, the adjustment of staffing levels, and the improvement of training and performance of management and supervisory personnel; and (10) the privatization and commercialization of entities within the territorial government. Id. at § 2145(a).

Not later than 90 days after receiving the recommendations, the Governor or the Legislature (whichever has the authority to adopt the recommendation) shall submit a statement to the Board that provides notice as to whether the territorial government will adopt the recommendation. Id. at § 2145(b)(1). If the recommendations are adopted, the Governor or the Legislature shall include in the statement a written plan to implement the recommendations that includes specific performance measures to determine the extent to which the territorial government has adopted the recommendation; and a clear and specific timetable pursuant to which the territorial government will implement the recommendation. Id. at § 2145(b)(2). In case the Governor or Legislature decide not to adopt any of the recommendations, they shall include in the statement, explanations for the rejection of the recommendations, and shall submit the statement of explanations to the President and Congress. Id. at § 2145(b)(3).

9. Funding

The territorial government must designate a dedicated funding source not subject to subsequent legislative appropriations, sufficient to support the Board's annual expenses as the Board in its sole and exclusive discretion determines. Id. at § 2127(b)(1). Similarly, the Governor must transfer or cause to be transferred on the date the Board is established and on the 5th day of each month thereafter, the greater of $2,000,000 or such amount as the Board may determine to a new account established by the territorial government, which shall be available to and subject to the exclusive control of the Board without any legislative appropriations of the territorial government. Id.

10. Compliance

Any officer or employee of the territorial government who prepares, presents, or certifies any information or report for the Board or any of its agents that is intentionally false or misleading, or upon learning that any such information is false or misleading, fails to immediately advise the Board or its agents in writing, shall be subject to prosecution and penalties under any laws of the territory prohibiting the provision of false information to government officials. Id. at § 2124(k). In addition, any officer of the territorial government who takes any action in violation of any valid order of the Board or refuses to take any action required by any such order, shall be subject to the appropriate administrative discipline, including, when appropriate, suspension from duty without pay or removal from office, by order of the Governor. Id. The Governor shall immediately report to the Board all pertinent facts together with a statement of the action taken thereon. Id.

**D. Interplay of U.S. – Puerto Rico Relationship and Congressional Intent**

Discernment of congressional intent as to Puerto Rico comes with a unique twist: an assumption that when enacting the statute, Congress was aware of how the relationship between Puerto Rico and the United States would develop in the decades to come. See, Maldonado-Burgos, 844 F.3d at 347 (so noting)(citing Córdova, 649 F.2d at 39). The baseline of Córdova was the 1950-1952 period culminating in enactment of the Federal Relations Act and Congress' approval of the Puerto Rico Constitution. See, 649 F.2d at 41. So Córdova observed that, had the framers of the Sherman Act been aware of the Federal Relations Act and the subsequent constitutional developments, they would have intended that Puerto Rico be treated as a "state" once Commonwealth status was achieved. Id. at 42.[10]

Applying the same analysis, Maldonado-Burgos asked whether the Mann Acts framers, if aware of Puerto Rico's constitutional status, would have intended it to be treated as a state or territory. Maldonado-Burgos, 844 F.3d at 350. And thus, it concluded that against the backdrop of clear congressional intent to grant Puerto Rico state-like autonomy, had the framers of § 2421(a) known of the evolution of the relationship between Puerto Rico and the United States that took place in the decades since the passage of the Mann act, they would have intended that § 2421(a) treat Puerto Rico similarly to the states. Id.

Adding PROMESA to the mix, it changes the legal landscape within which to evaluate the application of § 2423(a) to transportation within the Commonwealth, for it subjects Puerto Rico to a degree of federal control to which no State is subjected.[11] If the framers of § 2423(a) had been

---

[10] That Puerto Rico is constitutionally a territory of the United States makes no difference in this analysis. See, Maldonado-Burgos, 844 F.3d at 345 (so noting)(citing Jusino Mercado v. Puerto Rico, 214 F.3d 34, 40-44 (1st Cir. 2000)(acknowledging Congress' constitutional authority to legislate for Puerto Rico differently than for the states but nonetheless applying Córdova to the question whether Congress intended a particular statute to treat Puerto Rico as a state or a territory)).

[11] There would be little, if any constitutional tolerance in case Congress attempted to act similarly in case of a State. See, New York v. United States, 505 U.S. 144, 162 (1992)("While Congress has substantial powers to govern the Nation directly, including

aware of the 1950-1952 features of the Commonwealth as modified by Congress in PROMESA, they would not have seen the functional equivalent of a State.[12] For the same reason, they would not have intended that Puerto Rico be treated as a State. The interaction of the Federal Relations Act, the Puerto Rico Constitution and PROMESA does not add up to a degree of autonomy associated with states of the United States.

Finally, as noted earlier, the Puerto Rico Constitutional Convention adopted "Commonwealth of Puerto Rico" as the official English language of Puerto Rico because from the Convention's perspective, the word "commonwealth" was the appropriate translation of Puerto Rico's Spanish-language name: Estado Libre Asociado. And in 1998, Congress added the term "commonwealth" to § 2423(a), albeit not to § 2421. The addition is an indicator of congressional intent, as it is a general principle of statutory construction that when Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion. See, Barhart v. Sigmon Coal Co., 534 U.S. 438, 452 (2002)(stating principle). Hence, § 2423(a) covers the activity for which defendant has been charged, of transporting minor(s) within Puerto Rico to engage in illegal sexual activity.[13]

---

in areas of intimate concern to the States, the Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' instructions"). In enacting PROMESA, however, Congress explicitly stated to have acted "pursuant to Article IV, section 3 of the Constitution (the Territorial Clause), which provides Congress the power to dispose of and make all needful rules and regulations for territories." See, 48 U.S.C. § 2121(b)(2). The Territorial Clause does not confer Congress authority to legislate as to States. Yet it entrusts Congress with authority to treat Puerto Rico and other territories "differently from States so long as there is a rational basis for its actions." Harris v. Rosario, 446 U.S. 651, 652 (1980).

[12] Not only did the People of Puerto Rico not vote for PROMESA, but as observed above, its elected representatives may not exercise any control, supervision, oversight or review over the Board or its activities; nor enact, implement, or enforce any statute, resolution, policy, or rule that would impair or defeat the purposes of PROMESA, as determined by the Board, 48 U.S.C. § 2128(a). In addition, they may be required to live under budgets and Fiscal Plans with which their elected representatives do not agree; the laws its elected representatives enact as well as the contracts, rules, regulations, and executive orders they issue may be enjoined in the Board's discretion; and they must fund the Board – one they did not elect – with the taxes they pay.

[13] See, United States v. Byron Montijo-Maisonet, ---F.Supp.3d----, 2017 WL 2392503 at *1-*2 (June 2, 2017)( denying motion to dismiss § 2423 count alleging intra-commonwealth transportation of a minor because the section criminalizes the transportation of minors within a commonwealth of the United States for the purpose of engaging in sexual acts); United States v. Cotto-Flores, 2016 WL 5818476, *1-*3 (Oct. 5, 2016)(same).

### III.   CONCLUSION

Section 2423(a) allows the government to prosecute cases when the underlying conduct occurs solely within the borders of the Commonwealth.  As such, it embraces the conduct alleged in the indictment here.  With that in mind, the motion to dismiss is DENIED.

**SO ORDERED.**

In San Juan, Puerto Rico, this 5th day of June, 2017.

s/Pedro A. Delgado-Hernández
PEDRO A. DELGADO-HERNÁNDEZ
U.S. DISTRICT JUDGE
